Opinion filed December 15, 2022



**In The**

# Eleventh Court of Appeals

_____

## No. 11-21-00033-CV

_____

**RUSTIC NATURAL RESOURCES LLC (F/K/A RUSTIC RESOURCES, LLC), RUSTIC LAND HOLDINGS, LLC, AND TORTOISE HOLDINGS, LLC, Appellants/Cross-Appellees**

**V.**

**DE MIDLAND III LLC AND ENDEAVOR ENERGY RESOURCES, L.P., Appellees/Cross-Appellants**

**On Appeal from the 142nd District Court**
**Midland County, Texas**
**Trial Court Cause No. CV54515**

## O P I N I O N

This appeal concerns the interpretation and application of the terms of a mediated settlement agreement (MSA) executed by Appellants (the Rustic parties) and Appellees, DE Midland III LLC and Endeavor Energy Resources, L.P.[1] After

---

[1]For ease of reference, we also refer to Appellants, collectively, as either "Rustic" or "the Rustic parties."

the execution of the MSA, the parties continued to negotiate the inclusion of other conditions to their agreement. However, a dispute arose over proposed conditions, including the execution of a stipulation and cross-conveyance (stipulation) between Appellants and Endeavor, as well as the specific terms of several joint operating agreements (JOAs) which the MSA required that the parties execute to govern their future relationships. After the parties' post-MSA negotiations failed, Appellees filed a joint motion for summary judgment to enforce the MSA. The trial court granted the motion and entered judgment in favor of Appellees. In its judgment, the trial court further ordered Appellants to execute the versions of the stipulation and JOAs proposed by Appellees.

Appellants appeal the trial court's grant of summary judgment in favor of Appellees. In three issues, Appellants contend: (1) the trial court erred when it granted summary judgment and found that the parties were bound by the MSA, despite the plain intent of the parties to continue negotiating essential terms of the MSA, which left unresolved a multitude of critical issues related to mineral interest ownership and the rights and remedies of the parties; (2) the MSA merely constitutes an "agreement to agree" because it left the essential terms of the agreement open to further negotiation; and (3) the trial court impermissibly supplied the missing essential terms of the agreement and imposed upon Appellants a deal to which they did not agree. Additionally, Appellees filed a conditional cross-appeal in which they urge us to consider the merits of the underlying title dispute in the event that we hold that the MSA is unenforceable. For the reasons discussed below, we reverse and remand.

## I. *Factual and Procedural Background*

The underlying dispute that resulted in the execution of the MSA involves the ownership of certain mineral interests. Appellants claim mineral interest ownership

in certain depths under thirty-nine tracts of land located in Midland County.  The origins of this title dispute concern a complicated web of farmout agreements and assignments that were executed in the 1960s and 1970s.  Each disputed tract is subject to a farmout agreement with a continuous drilling program.  Under the terms of the continuous drilling programs, if the farmee drills a well on a tract, the farmee earns an assignment of that tract for depths that extend to 100 feet below the total depth of each well drilled on the tract by the farmee.

Appellants' predecessors-in-interest—we refer to them as the Baxter Group—held interests in the subject tracts.  Through a series of farmout agreements and subsequent assignments, the Baxter Group conveyed its rights and interests to John L. Cox.

The Baxter Group first executed a farmout agreement with Cox.  This instrument, referred to as the 1969 Baxter Group/Cox Farmout, concerned nineteen of the subject tracts.  Soon after this, the Baxter Group assigned "all of their right, title and interest" in the nineteen farmout tracts, from "the surface of the ground to the base of the Wolfcamp formation" to Cox.  This instrument, referred to as the First Baxter Group/Cox Assignment, recited that the parties were executing a single blanket assignment for their convenience, rather than a separate assignment for each tract drilled upon as per the terms of the continuous drilling program of the farmout agreement.  This assignment further included a "Reassignment Clause," which provided that upon completion of the continuous drilling program, Cox would reassign any interests for the interval between the depth of 100 feet below the total depth drilled on each tract and the base of the Wolfcamp formation.  It is undisputed that Cox drilled and completed wells on all nineteen tracts, but often not to the base of the Wolfcamp formation.  Thus, under the terms of the continuous drilling program, Cox arguably left "unearned" some intervals between 100 feet below the

3

total drilling depth and the base of the Wolfcamp formation. Because the Baxter Group had already conveyed their interests via the First Baxter Group/Cox Assignment, they did not execute any further assignments to Cox for these tracts after a well was successfully drilled.

Next, for the remaining twenty tracts that are in dispute, the Baxter Group executed two other assignments to Cox (referred to as the Second and Third Baxter Group/Cox Assignments). These two assignments differed from the First Assignment in one significant respect: they covered interests from "the top of the Spraberry formation down to the base of the Wolfcamp formation," rather than from "the surface of the ground to the base of the Wolfcamp formation." It is undisputed that Cox drilled and completed wells on all twenty tracts as well, but often not to the base of the Wolfcamp formation. Again, because the Baxter Group had already assigned their interests in the farmout tracts to Cox, via the Second and Third Assignments, from "the top of the Spraberry formation down to the base of the Wolfcamp formation," they did not execute any further assignments to Cox after a well was subsequently drilled.

Decades later, in 2018, the successors-in-interest to John L. Cox—JM Cox Resources, L.P., Alpine Oil Company, and James Kelly Cox—executed an assignment purporting to convey Cox's interests in the tracts to DE Midland. DE Midland then executed an assignment purporting to convey some of its interests in the tracts to Endeavor. In the underlying suit, Appellants' primary claim is that by drilling wells on these tracts, Cox failed to earn title to all of the depths which Cox's assignment to DE Midland (and therefore DE Midland's assignment to Endeavor) purported to convey.

In 2018, Endeavor filed suit against JM Cox Resources, L.P., Alpine Oil Company, James Kelly Cox, and Texas Settlers Resources, Inc. for trespass to try

4

title and to remove a cloud on its title. Appellants intervened in the case and also asserted claims for trespass to try title and to quiet title. Soon thereafter, Endeavor nonsuited the Cox Defendants and Texas Settlers. Appellants then amended its Petition in Intervention and joined DE Midland and Endeavor as defendants to its title claims.

In their operative pleading, Appellants claimed (1) title to certain depths in all thirty-nine farmout tracts and (2) title to all depths claimed by the farmees in twenty-six of the farmout tracts. Throughout the trial court proceedings, the parties referred to these two distinct types of claims as the "Unearned Depths" claims and the "Terminated Depths" claims. As to the "Unearned Depths" claims, Appellants claimed title to depths ranging from 100 feet below the total depth of any well drilled by Cox to the base of the Wolfcamp formation. In that regard, Appellants asserted that Cox *never earned* an ownership interest in those depths, and therefore his successors-in-interest (DE Midland and Endeavor) never acquired title to those depths. As to the "Terminated Depths" claims, Appellants asserted that other interests as to certain depths which Cox *did earn* have since fully terminated under the terms of the farmouts and assignments.

The parties filed extensive motions for summary judgment. Appellees each filed motions for summary judgment challenging Appellants' "Terminated Depths" claims, and Endeavor filed a motion for partial summary judgment challenging Appellants' "Unearned Depths" claims, which DE Midland adopted. Appellants filed a motion for summary judgment based on contract interpretation. Although the trial court held a hearing on these motions, it did not rule on them. While these motions were still pending, the parties proceeded to mediation and executed the MSA at issue in this appeal.

The MSA contains only seven paragraphs, spanning two pages. The controversy before us primarily turns on the language in the first two paragraphs, which require the execution of several additional key documents by an agreed deadline—the stipulation and cross-conveyance, and the JOAs. We examine the language of the MSA in our analysis below.

After the parties executed the MSA, they commenced negotiating the terms of the stipulation and the JOAs. These negotiations were contentious and necessitated three agreed extensions of the original agreed deadline for the execution of the JOAs and the stipulation and cross conveyance between Appellants and Endeavor. The parties' negotiations ultimately failed. As a result, Appellees filed a joint motion for summary judgment to enforce the terms of the MSA. Appellants filed a response, and after a hearing, the trial court granted Appellees' joint motion and denied all other relief not granted in its order. Further, the trial court ordered Appellants to execute the most recent versions of the disputed documents that were prepared and proposed by Appellees. This appeal followed.

## II. *Analysis*

### A. *Standard of Review – Summary Judgment*

We review a trial court's grant of a summary judgment de novo. *Concho Res., Inc. v. Ellison*, 627 S.W.3d 226, 233 (Tex. 2021) (citing *Valence Operating Co. v. Dorsett*, 164 S.W.3d 656, 661 (Tex. 2005)). To prevail under the traditional summary judgment standard, the movant has the burden to establish that there is no genuine issue of material fact and that it is entitled to judgment as a matter of law. TEX. R. CIV. P. 166a(a), (c); *ConocoPhillips Co. v. Koopmann*, 547 S.W.3d 858, 865 (Tex. 2018); *Provident Life & Accident Ins. Co. v. Knott*, 128 S.W.3d 211, 216 (Tex. 2003). If the movant establishes its summary judgment burden, the burden shifts to the nonmovant to present evidence that raises a genuine issue of material fact that

would preclude the grant of summary judgment. *Amedysis, Inc. v. Kingwood Home Health Care, LLC*, 437 S.W.3d 507, 510–11 (Tex. 2014); *M.D. Anderson Hosp. & Tumor Inst. v. Willrich*, 28 S.W.3d 22, 23 (Tex. 2000).

To determine if a genuine issue of material fact exists, we review the evidence in the light most favorable to the nonmovant, and we indulge every reasonable inference and resolve any doubts in the nonmovant's favor. *KMS Retail Rowlett, LP v. City of Rowlett*, 593 S.W.3d 175, 181 (Tex. 2019); *Knott*, 128 S.W.3d at 215. We credit evidence that is favorable to the nonmovant if reasonable jurors could do so, and we disregard contrary evidence unless reasonable jurors could not. *Samson Expl., LLC v. T.S. Reed Props., Inc.*, 521 S.W.3d 766, 774 (Tex. 2017); *Mann Frankfort Stein & Lipp Advisors, Inc. v. Fielding*, 289 S.W.3d 844, 848 (Tex. 2009). The evidence raises a genuine issue of material fact if "reasonable and fair-minded jurors could differ in their conclusions in light of all the evidence presented." *Goodyear Tire & Rubber Co. v. Mayes*, 236 S.W.3d 754, 755 (Tex. 2007).

B. *Governing Law*

Our interpretation of the parties' MSA is governed by contract law, including the principles of contract construction. *See* TEX. CIV. PRAC. & REM. CODE ANN. § 154.071 (West 2019); *Shamrock Psychiatric Clinic, P.A. v. Tex. Dep't of Health & Human Servs.*, 540 S.W.3d 553, 560 (Tex. 2018); *Loya v. Loya*, 526 S.W.3d 448, 451 (Tex. 2017). The presence of ambiguities and the interpretation of an unambiguous contract are questions of law that we review de novo. *URI, Inc. v. Kleberg Cnty.*, 543 S.W.3d 755, 763 (Tex. 2018); *MCI Telecomms. Corp. v. Tex. Utils. Elec. Co.*, 995 S.W.2d 647, 650–51 (Tex. 1999). We enforce unambiguous contracts as written. *Bluestone Nat. Res. II, LLC v. Randle*, 620 S.W.3d 380, 387 (Tex. 2021). When a dispute exists concerning a contract's meaning, we must ascertain and give effect to the parties' expressed intent, and objective

manifestations of intent control. *See id.*; *URI*, 543 S.W.3d at 763–64. As such, we presume that the parties intended "what the words of their contract say," and we interpret the contract's language according to its "plain, ordinary, and generally accepted meaning." *URI*, 543 S.W.3d at 764.

An ambiguity does not arise simply because the parties to an agreement advance differing interpretations. *Rosetta Res. Operating, LP v. Martin*, 645 S.W.3d 212, 219 (Tex. 2022) (citing *Apache Deepwater, LLC v. McDaniel Partners, Ltd.*, 485 S.W.3d 900, 904 (Tex. 2016)). If we determine that the agreement's language can be given a certain or definitive legal meaning or interpretation, the agreement is not ambiguous, and we will construe it as a matter of law. *Barrow-Shaver Res. Co. v. Carrizo Oil & Gas, Inc.*, 590 S.W.3d 471, 479 (Tex. 2019) (citing *El Paso Field Servs., L.P. v. MasTec N. Am., Inc.*, 389 S.W.3d 802, 806 (Tex. 2012)).

Because we do not consider extrinsic evidence in determining whether a contract is ambiguous, nor in construing a contract that we have determined to be unambiguous, we examine the contract "as a whole in light of the circumstances present when the contract was entered." *Nat'l Union Fire Ins. Co. v. CBI Indus., Inc.*, 907 S.W.2d 517, 520 (Tex. 1995); *see Lewis v. E. Tex. Fin. Co.*, 146 S.W.2d 977, 980 (1941). Even if a contract is unambiguous as a matter of law, we may still consider the objective facts and circumstances surrounding the context of the parties' contract as an aid in the construction of the contract's language. *Barrow-Shaver*, 590 S.W.3d at 483–84; *URI*, 543 S.W.3d at 767–68; *Kachina Pipeline Co. v. Lillis*, 471 S.W.3d 445, 450 (Tex. 2015). "While 'evidence of circumstances can be used to inform the contract text and render it capable of only one meaning, extrinsic evidence can be considered only to interpret an *ambiguous* writing, not to create ambiguity.'" *Barrow-Shaver*, 590 S.W.3d at 483 (quoting *Lillis*, 471 S.W.3d at 450); *URI*, 543 S.W.3d at 763 ("In construing an unambiguous contract or in

8

determining whether an ambiguity exists, courts may not seek the parties' intent beyond the meaning the contract language reasonably yields when construed in context.").

An agreement to enter into contracts in the future is enforceable if the agreement addresses all of its essential terms with "a reasonable degree of certainty and definiteness." *Fischer v. CTMI, L.L.C.*, 479 S.W.3d 231, 237 (Tex. 2016). Whether a settlement agreement fails for lack of essential terms is a question of law unless the agreement is ambiguous, or the surrounding facts and circumstances demonstrate a factual issue. *See Gen. Metal Fabricating Corp. v. Stergiou*, 438 S.W.3d 737, 744 (Tex. App.—Houston [1st Dist.] 2014, no pet.) (citing *McCalla v. Baker's Campground, Inc.*, 416 S.W.3d 416, 418 (Tex. 2013)).

Although it is difficult to definitively establish which terms of the agreement are essential, "a contract must at least be sufficiently definite to confirm that both parties actually intended to be contractually bound." *Fischer*, 479 S.W.3d at 237; *see Fort Worth Indep. Sch. Dist. v. City of Fort Worth*, 22 S.W.3d 831, 846 (Tex. 2000); *T.O. Stanley Boot Co. v. Bank of El Paso*, 847 S.W.2d 218, 221 (Tex. 1992). Notably, however, "[i]t is a rule universally recognized that if an instrument admits of two constructions, one of which would make it valid and the other invalid, the former must prevail." *Fischer*, 479 S.W.3d at 239 (quoting *Dahlberg v. Holden*, 238 S.W.2d 699, 701 (Tex. 1951)). Material and essential terms are those that the parties "would reasonably regard as vitally important ingredients of their bargain." *Id.* at 237 (internal quotations omitted). Whether a contract contains all essential terms should be determined on a case-by-case basis, and the "primary purpose" of the contract governs our determination. *Barrow-Shaver*, 590 S.W.3d at 481–82. Therefore, a "court may uphold an agreement by supplying missing terms but may not create a contract where none exists and, generally, may not interpolate or

eliminate essential terms." *Jennings v. Jennings*, 625 S.W.3d 854, 862 (Tex. App.—San Antonio 2021, pet. denied).

When parties to a purported agreement agree to leave some terms unresolved, the critical issue for determining the agreement's enforceability is whether the parties intended for their agreement to be binding and enforceable even in the absence of an agreement on the remaining, unresolved terms, or whether they intended for their agreement to have no legal significance until an agreement on the remaining terms is reached. *See Stergiou*, 438 S.W.3d at 748 & n.9 (collecting cases). The question of the parties' intent in this context is typically a fact issue. *See Foreca, S.A. v. GRD Dev. Co.*, 758 S.W.2d 744, 746 (Tex. 1988) (citing *Scott v. Ingle Bros. Pacific, Inc.*, 489 S.W.2d 554, 555–57 (Tex. 1972)); *Stergiou*, 438 S.W.3d at 749. However, in cases where "the intent is clear and unambiguous on the face of the agreement," a court may determine the intentions of the parties as a matter of law. *Hardman v. Dault*, 2 S.W.3d 378, 380 (Tex. App.—San Antonio 1999, no pet.); *see Jennings*, 625 S.W.3d at 863; *Stergiou*, 438 S.W.3d at 749.

C. *The Parties' Intent to be Bound Raises a Fact Question*

The parties present a myriad of arguments in support of their respective interpretations of the MSA. Nevertheless, the crux of this appeal is the content of the model form JOAs to which the MSA refers. Paragraph Two of the MSA clearly specifies that the parties shall execute JOAs "based on" the model form; however, with the exception of five specific conditions identified in the MSA, the MSA does not elaborate further as to what other terms or conditions shall be contained in the contemplated JOAs. This silence is fatal to Appellees' arguments.

JOAs are complex documents which govern the day-to-day operations of operators and non-operators. Here, we conclude that the language of the MSA is ambiguous as to (1) the parties' intent regarding the content of the model form JOAs

referred to in the MSA that the parties were required to execute and (2) the remaining terms and conditions that the parties intended to include in the JOAs. The MSA requires the execution of JOAs "based on" the 2015 AAPL Model Form JOA. The MSA further enumerates five specific conditions that must be included in the JOAs. After executing the MSA, the parties attempted for months, but ultimately were unable, to negotiate what additional terms and conditions should be included in the JOAs.

For the MSA to be an intelligible agreement, the 2015 AAPL Model Form JOA requires that the parties must, at the very least, agree (1) to populate several fields and (2) to select various "options." Though the parties may disagree as to the significance these terms may have on the effectiveness of the JOAs or to the primary purpose of the MSA itself, it is unavoidable that without these terms, the JOAs (and consequently the MSA itself) cannot be intelligible, enforceable contracts.

A contract is ambiguous when two reasonable interpretations are possible. When we determine whether a contract is ambiguous, and in construing the contract itself, we may refer to the surrounding circumstances. The parties to this dispute are sophisticated actors and they are undoubtedly familiar with the model form JOA which is referenced in the MSA. As we have said, the model form JOA requires that certain fields be populated and that certain "options" be selected in order for the JOA to become an intelligible contract. In this instance, it is unclear from the plain language of the MSA whether the parties intended for the "based on" language to allow for one party to the agreement to unilaterally populate the required fields and select the "options" required by the form. A reasonable alternative construction could be that, considering the "based on" language, the parties intended that the MSA was merely an "agreement to agree" (which is not an enforceable agreement) and that no binding, enforceable agreement would exist until the JOAs, and all of its

11

essential terms, had been negotiated, agreed-to, and executed. Either of these constructions is reasonable, and each reading leads to a different result with respect to our construction of the MSA. Therefore, because the intent of the parties is not "clear and unambiguous," a question of fact exists.

Appellees argue that, when read in its proper context, the plain language of the MSA indicates that the parties intended for it to be a binding and enforceable agreement, even though some unresolved, "nonessential" terms would be negotiated in the future. *See McCalla*, 416 S.W.3d at 418 (holding that agreements to enter into future contracts are enforceable if they contain all essential terms); *Fischer*, 479 S.W.3d at 238 ("[An] agreement that contains all of its essential terms is not unenforceable merely because the parties anticipate some future agreement."). Although, in certain contexts, an MSA with similar language could be read in the manner Appellees now advance on appeal, in *this* case, at least some terms or required changes that were left unaddressed in the JOAs that the parties were required to execute are *essential* to the enforceability of the parties' agreement. *Barrow-Shaver*, 590 S.W.3d at 481–82.

As we have noted, the parties to the MSA are familiar with the model form JOA and what its use entails; they are sophisticated members of the oil and gas industry. *See id.* at 483 ("We can consider the surrounding circumstances, however, including the fact that negotiations took place between sophisticated parties in this commercial oil and gas context."). From the inception of this dispute, the parties were represented by experienced oil and gas attorneys in an arm's-length transaction. *Id.* at 484. After significant motion practice in the district court, they proceeded to mediation, which in turn resulted in the execution of the MSA by each party to this case and their counsel. *See id.* Considering that these parties have significant experience in oil and gas matters, it seems implausible that they were not intimately

12

familiar with the model form JOA and what its terms and use would require. It seems equally implausible that either party would execute an MSA without the inclusion of all the *essential* terms of the parties' agreement.

Appellees contend that the unaddressed terms of the JOA were not essential to the primary purpose of the MSA, which they argue resolved the underlying title dispute and concluded the related litigation. Although we understand Appellees' position—not only were the remaining JOA terms not included in the MSA itself, but they were also specifically accounted for by their relegation to the model form— we cannot ignore the fact that properly executed JOAs are inarguably essential to the parties' MSA, and that enforceable, intelligible JOAs cannot be achieved without the parties' mutual agreement and assent as to at least some of the remaining, and essential, unresolved JOA terms.

Based on the circumstances before us, we conclude that the MSA is ambiguous as to the parties' intent with respect to the meaning of the requirement in Paragraph Two that the JOAs be "based on" the model form JOA. This language raises a question of material fact. As such, the trial court erred when it granted Appellees' joint motion for summary judgment and enforced the MSA. Accordingly, we sustain Appellants' first and second issues.

For similar reasons, we also sustain Appellants' third issue. Appellants complain in their third issue that the trial court's final order impermissibly directed them to enter into agreements (the JOAs) to which they did not assent. We agree. Therefore, even if the MSA's language did not raise a genuine issue of material fact, the trial court erred when it ordered Appellants to execute the versions of the JOAs that were prepared and tendered by Appellees.

As we discussed above, the model form JOA requires the inclusion of certain terms and the selection of certain "options" in order for it to constitute an intelligible

13

contract. Appellees made various changes and unilaterally selected four "options" in the JOA versions, changes and "option" selections to which Appellants did not agree. The trial court's final order directed Appellants to execute these versions of the JOAs. But, even assuming *arguendo* that the MSA itself is enforceable, the trial court's authority to order Appellants to execute these versions of the JOAs is limited to the scope of the MSA and the terms recited within it. *See Fischer*, 479 S.W.3d at 242 ("[C]ourts cannot rewrite the parties' contract or add to or subtract from its language."); *XTO Energy Inc. v. Smith Prod. Inc.*, 282 S.W.3d 672, 680 (Tex. App.—Houston [14th Dist.] 2009, pet. dism'd) (refusing to rewrite or add to JOAs based on a previous version of the model form and enforcing the agreements as written).

The MSA requires that five enumerated terms shall be included in the JOAs and that the JOAs shall be "based on" the model form. Importantly, the MSA does not authorize either party to unilaterally complete or select "options" in the model form in order to render it an intelligible contract, and thus bind all parties to the unilateral choices that were made; however, this is precisely what Appellees did in the versions of the JOAs that they prepared and tendered to the trial court. Here, the trial court's final order effectively directs Appellants to execute a contract to which Appellants have not agreed. The trial court had no authority or discretion to do so, and it may not supply essential terms or conditions that are absent from the parties' agreement. *See Fischer*, 479 S.W.3d at 242; *XTO Energy*, 282 S.W.3d at 680. Accordingly, we sustain Appellants' third issue.

D. *Appellees' Cross-Appeal*

Finally, we turn to Appellees' conditional cross-appeal. As Cross-Appellants, Endeavor and DE Midland argue that we should render judgment in their favor on the underlying merits dispute—regarding title to the "Terminated Depths" Claims

and "Unearned Depths" Claims—which, according to Cross-Appellants and their interpretation of the MSA, the parties have purportedly settled. Cross-Appellants addressed these claims in their motions for summary judgment which, significantly, the trial court did not rule on.

As Cross-Appellees, Rustic argues that we do not have jurisdiction to consider DE Midland and Endeavor's conditional cross-appeal because (1) denied motions for summary judgment are not final and appealable and (2) the trial court did not grant, or rule on, any cross-motion for summary judgment that would otherwise be considered "final" for appellate purposes; therefore, Cross-Appellants' motions for summary judgment remain interlocutory. Conversely, Cross-Appellants contend that the trial court's grant of their joint motion for summary judgment to enforce the MSA provides us with jurisdiction to review and address the merits of the motions for summary that they claim the trial court denied. We agree with Rustic.

An order denying summary judgment is not final and appealable; such a denial means that a fact issue exists, or the movant has not carried its burden to prove the required elements as a matter of law. *See Cincinnati Life Ins. Co. v. Cates*, 927 S.W.2d 623, 625 (Tex. 1996). However, when both sides move for summary judgment and the trial court grants one motion and denies the other, the denial is reviewable as part of the appeal from the granted motion. *See Valence Operating Co. v. Dorsett*, 164 S.W.3d 656, 661 (Tex. 2005); *Apcar Inv. Partners VI v. Gaus*, 161 S.W.3d 137, 139 (Tex. App.—Eastland 2005, no pet.). Ordinarily, however, when cross-motions for summary judgment are involved, the parties must have sought final judgment relief in their cross-motions before a court of appeals may reverse and render the trial court's final judgment. *CU Lloyd's of Tex. v. Feldman*, 977 S.W.2d 568, 569 (Tex. 1998); *accord Bowman v. Lumberton Indep. Sch. Dist.*, 801 S.W.2d 883, 889 (Tex. 1990).

15

The general rule is that we can only review the denial of a motion for summary judgment when both parties in their cross-motions have moved for final judgment and one such motion is granted by the trial court. *See Fed. Deposit Ins. Corp. v. Lenk*, 361 S.W.3d 602, 611–12 (Tex. 2012) (citing *Valence Operating Co.*, 164 S.W.3d at 661). Further, and in this circumstance, the parties each must have moved for summary judgment "on the same issues." *Id.* at 612.

Cross-Appellants contend that because the trial court stated in its order granting their joint motion for summary judgment to enforce the MSA that it was a final, appealable order and that "all relief requested in this matter not expressly granted herein" was denied, their motions for summary judgment that addressed the merits of the underlying title dispute are no longer interlocutory and are appealable. They argue that in *Lenk*, a case cited by Rustic, the Texas Supreme Court did not announce a rule that appellate review of a summary judgment denial is *only* proper when the parties moved for summary judgment on the same issues. It is true that the court in *Lenk* noted that the language of the trial court's order *in that case* disposed of all issues in the case. *Id.* But the court also noted that the issue in dispute was also necessarily disposed of when the trial court ruled in one party's favor. *Id.*

Here, the trial court's summary judgment ruling in favor of Cross-Appellants only concerned whether the MSA was enforceable. In fact, the MSA and its enforceability *by their nature* precluded any disposition as to the merits of the underlying title dispute—in other words, the enforceability of the MSA and the merits of the case are separate and independent considerations. If the trial court had ruled that the MSA was unenforceable, it should have then considered Cross-Appellants' pending motions for summary judgment on the merits (which the trial court never ruled on) as the next dispositive issues. However, because the trial court ruled in favor of enforceability, there was no need to turn to the merits.

16

Cross-Appellants also cite to *Baker Hughes* in support of their proposition that we have jurisdiction to review their "merits" motions. *Baker Hughes, Inc. v. Keco R. & D., Inc.*, 12 S.W.3d 1, 5 (Tex. 1999). In that case, the Texas Supreme Court held that a court of appeals may review a previously denied motion for summary judgment that would otherwise support the grant of summary judgment on appeal as an alternative basis for affirming the trial court's judgment. *Id.* at 5–6 (citing *Cates*, 927 S.W.2d at 624–26). Cross-Appellants' argument is not persuasive.

In this case, the challenge to the trial court's grant of summary judgment only concerns the enforcement of the MSA, not the merits of the underlying dispute that was purportedly settled *by* the MSA. Unlike in *Baker Hughes*, where review of the summary judgment denial could have resulted in an affirmation of the trial court's judgment, Cross-Appellants' pre-MSA motions for summary judgment on the "merits" cannot provide a basis for affirming the trial court in this appeal. *See Baker Hughes*, 12 S.W.3d at 2–4. According to Cross-Appellants, the claims addressed in their pre-MSA motions were purportedly settled by the parties, voluntarily, through the MSA. Nevertheless, the course of this litigation was derailed and redirected when the parties notified the trial court that they had reached a settlement but later failed to consummate the remaining details of the settlement, which resulted in the parties returning to the trial court to present their interpretations of the MSA itself.

It is significant that the trial court's ruling regarding the enforceability of the MSA does not in any manner touch upon the claims that were purportedly settled and released by the MSA. Rather, the trial court's judgment is predicated on entirely different issues and grounds when compared to the arguments raised by Cross-Appellants in their "merits" motions. Yet, Cross-Appellants insist that the trial court's judgment should preclude any further factfinding and rulings by the trial court on the merits of their underlying motions. They further point to judicial

17

economy as another reason for us to review, what they argue are, denied motions; however, we disagree with Cross-Appellants' assertion that a remand is not necessary here. *See* TEX. R. APP. P. 43.3.

Furthermore, even if we did possess the discretion to review Cross-Appellants' "merits" motions, we decline to do so because the trial court neither issued a substantive ruling nor signed an order addressing the merits of these motions. *See Cates*, 927 S.W.2d at 626. Accordingly, we overrule Cross-Appellants' cross-point.

### III. *This Court's Ruling*

We reverse the judgment of the trial court and remand this cause to the trial court for further proceedings consistent with this opinion.

W. STACY TROTTER

JUSTICE

December 15, 2022

Panel consists of: Bailey, C.J.,
Trotter, J., and Wright, S.C.J.[2]

Williams, J., not participating.

---

[2]Jim R. Wright, Senior Chief Justice (Retired), Court of Appeals, 11th District of Texas at Eastland, sitting by assignment.